DECISION. *Page 2 
{¶ 1} Jason Miller shot and killed Ronald Perkins. Miller testified at trial that he had killed Perkins in self-defense. The jury did not believe him and found him guilty of murder. Miller now appeals his conviction. We affirm.
 I. Three Stories {¶ 2} Perkins had moved out of his apartment on Wade Street in Cincinnati on the day of the murder. He had returned to the apartment to gather the rest of his belongings.
 {¶ 3} Miller came to Perkins's old apartment, either to collect a drug debt or to check on a puppy that Perkins was caring for. At some point, the two men began to struggle. Perkins used a sword to severely cut Miller in the forehead, on his torso, and on his left hand. Miller shot at Perkins eight or nine times — a neighbor testified that the shots were simultaneous. One shot's entrance wound was in Perkins's back. Another entrance wound was at the top of his head.
 {¶ 4} The apartment looked, as one criminologist testified, like a scene out of the movie Psycho. As a result of the sword cuts, Miller's blood was splattered all over the apartment, on the front door, on the back door, and out onto the back sidewalk.
 {¶ 5} Miller went to University Hospital to get treatment for his cuts. While he was there, one of the criminologists who had been at the scene of the murder questioned him about what had happened. Miller was handcuffed to a gurney at the time. He told him that he had been attacked and robbed by a group of men, one with a butcher knife. Hours later, Miller was transported to the Broadway police station. There, he was handcuffed to a chair and questioned by two police officers. He told the officers that his name was James Johnson, and he repeated the story that he had *Page 3 
been attacked by men with a butcher knife. None of these police officers read Miller his Miranda rights prior to questioning him.
 {¶ 6} Detective Colin Vaughn had been listening to the interview at the police station. Vaughn knew Miller and knew that he was lying about his alias. Vaughn entered the room and then read Miller his rights. Miller indicated that he understood his rights.
 {¶ 7} Miller told Vaughn a second story. He said that he had gone to see Perkins to collect a drug debt and that Perkins had drawn a gun on him as soon as he walked in the door. He claimed that he had not been carrying a gun. Miller said that he had struggled with Perkins, had forced the gun out of his hands, and then had tried to escape. He told Vaughn that Perkins had then attacked him with the sword. Miller told Vaughn that he was able to get to the gun and then fired the shots at Perkins to defend himself.
 {¶ 8} Miller's conversations with the police officers at the police station had been tape-recorded. The state did not provide Miller with the tape during discovery because the prosecuting attorney did not know of the tape's existence. The state told Miller and the court about it on the second day of trial.
 {¶ 9} At trial, Miller testified on his own behalf and revealed yet another account of what had happened. He said that he had gone to see Perkins to check on a puppy that Perkins and his girlfriend had been caring for, and that he had not been dealing drugs.
 {¶ 10} After Miller testified, the state recalled Vaughn for the purpose of impeaching Miller's credibility. The trial court allowed the state to play the tape of Miller's interviews with the police officers at the station. This was three days after the state had first disclosed the existence of the tape. *Page 4 
 {¶ 11} The jury did not believe that Miller had killed Perkins in self-defense and found him guilty of murder. This appeal followed.
 II. Assignments of Error {¶ 12} Miller argues that the trial court erred by (1) convicting him on insufficient evidence and against the manifest weight of the evidence; (2) allowing the state to introduce Miller's statements to the police that he had given before the officers had read him hisMiranda rights; (3) violating Miller's Sixth Amendment right to counsel; (4) giving erroneous and prejudicial jury instructions; (5) allowing the state to introduce taped statements that had not been disclosed during discovery; (6) subjecting Miller to ineffective assistance of counsel; and (7) permitting a series of errors that cumulatively denied Miller a fair trial.
 III. Insufficient Evidence/Manifest Weight {¶ 13} To determine if a conviction is supported by sufficient evidence, this court views the evidence in a light most favorable to the prosecution and determines whether any rational jury could have found that the essential elements of the offense had been proved beyond a reasonable doubt.[1] When reviewing the manifest weight of the evidence, this court reviews the record, weighs the evidence, considers the credibility of the witnesses, and determines whether the jury clearly lost its way and created a manifest miscarriage of justice.[2]
 {¶ 14} In this case, the state met its burden to produce sufficient evidence for a murder conviction, and the jury did not lose its way and create a manifest miscarriage of justice by finding Miller guilty. *Page 5 
 {¶ 15} The state had to prove that Miller had purposely caused the death of Perkins. Miller testified that he had purposely shot Perkins in self-defense. Self-defense is an affirmative defense, so the burden shifted to Miller to prove, by a preponderance of the evidence, that he (1) was not at fault in creating the situation; (2) genuinely believed that he was in imminent danger of death or bodily harm, and that the only way to avoid the danger was to kill Perkins; and (3) did not violate a duty to retreat or avoid the danger.[3]
 {¶ 16} Miller originally told Vaughn that he had gone to see Perkins to collect a drug debt. Another witness stated that Miller had previously carried and displayed a gun when he was trying to collect drug debts. The jury could have reasonably believed that Miller had threatened Perkins with a gun when trying to collect the drug debt, which would have made him at fault in creating the situation.
 {¶ 17} It is clear from the evidence that Miller, at some point in the affray, was defending himself against imminent bodily harm or death — Perkins cut him across the face with the sword. But the legal standard for self-defense was not met if the jury believed that Miller was at fault in creating the situation.
 IV. Miranda Rights {¶ 18} During its case-in-chief, the state offered the testimony of the police officers who had heard Miller tell his first two stories: that his name was James Johnson and that he had been attacked by men with a butcher knife; and that he did kill Perkins, but in self-defense, and that he had visited him to collect a drug debt. Miller argues that these statements should not have been allowed into evidence.
 {¶ 19} Once Miller was in custody, the state had the duty to inform Miller of his Miranda rights: his right to remain silent and his right to an attorney.[4] *Page 6 
 {¶ 20} During the second interview at the police station, Vaughn clearly read Miller his rights, and Miller affirmatively said that he understood his rights. The second statement at the station was clearly admissible because Miller had by then waived his Miranda rights.
 {¶ 21} Miller also gave statements to the criminologist at the hospital and to police officers during the first interview at the station while he was in custody — he had been handcuffed on both occasions. And none of the officers read him his Miranda rights at any time during their conversations with Miller.
 {¶ 22} It is difficult to understand why the officers failed to read Miller his rights. But Miller did not raise the issue in the trial court. When a defendant does not raise an issue in the trial court, this court may not overturn a conviction or grant a new trial absent plain error.[5] Under a plain-error analysis, we will only reverse if the outcome clearly would have been different absent the error.
 {¶ 23} Here, we cannot say that Miller clearly would have been able to prove that he had killed Perkins in self-defense if the trial court had suppressed his first statement to police. While it would have been better for Miller to avoid the jury hearing his blatant lies to police, the absence of this evidence during the trial might or might not have changed the outcome. That is not enough for reversal under a plain-error analysis.
 V. Right to Counsel {¶ 24} Miller argues that the state violated his right to counsel during its closing argument. The state hypothesized about why Miller had changed his story from when he had spoken to Vaughn to when he had testified at trial. Miller had told *Page 7 
Vaughn that he was collecting a drug debt. But at trial, Miller denied that he had dealt drugs recently and said that he had gone to see Perkins only to check on his puppy. The state, in its closing argument, contended that Miller had changed his story because "now he knows the law. * * * He [did not] know that if you are at fault * * * you can't say self-defense. He knows better than that now."
 {¶ 25} If the state interferes with a defendant's right to counsel, prejudice is presumed.[6] But the interference with the defendant's right to counsel must be more than a few sentences in a closing statement. Although the statement in this case might have been inappropriate, it did not deprive Miller of his right to counsel. If, for example, the prosecutor had eavesdropped on a conversation between Miller and his attorney and told the jury about what he had heard, then that would have been sufficient to constitute interference with the right to counsel. But in this case, the state's closing argument did not interfere with Miller's right to counsel.
 VI. Jury Instructions {¶ 26} The trial court instructed the jury that there was no duty for Perkins to retreat from his own home. Miller argued at trial and argues now that this confused the jury and denied him a fair trial.
 {¶ 27} The jury instructions were erroneous. Perkins was not in his own home. He had moved out earlier that day. Miller argues that these instructions confused the jury and prejudiced him. But vague speculation is not enough to taint the jury's verdict. *Page 8 
 VII. Taped Statements {¶ 28} Miller argues that the trial court erroneously allowed the introduction of his taped interview with police, because the state had not produced the tape during discovery, but had only disclosed it two days after the trial had begun.
 {¶ 29} The state had a duty to provide the tape to Miller during discovery.[7] In this case, the state did not know about the existence of the tape until the trial had already started, and it then immediately disclosed the tape.
 {¶ 30} The trial court had the discretion to select a sanction for the discovery violation.[8] To determine whether the trial court abused its discretion, we consider whether the record demonstrates that (1) the state's failure to disclose was willful; (2) knowing about the tape earlier would have benefitted Miller in preparing his defense; or (3) Miller was prejudiced by the admission of the tape.[9]
 {¶ 31} The prosecutor did not know that the tape existed prior to trial and disclosed it immediately after becoming aware of it. While there was little excuse for not providing the tape in discovery — it had existed all along and the "state" consists of the police and the prosecution — knowing about the tape earlier would likely not have helped Miller to prepare his defense, so the admission of the tape did not prejudice Miller. First, the state had provided a summary of the interview to Miller during discovery, and officers testified in detail about their recollection of the two interviews. Even without the tape, the information would have been before the jury. Second, Miller knew three days before the tape was introduced that the state intended to use it if Miller testified on his own behalf. He had an opportunity to listen to the tape. But on the witness stand, he still told a story that was different *Page 9 
from the ones provided in the interviews. The court did not abuse its discretion by allowing the tape to be played to the jury.
 VIII. Ineffective Assistance of Counsel {¶ 32} For Miller to get a new trial because of ineffective assistance of counsel, he would have to show that his attorneys' performance fell below an objective standard of reasonable representation and that, but for the lawyers' performance, a reasonable probability existed that Miller would have been found not guilty.[10]
 {¶ 33} As we have previously stated, when the state responded to Miller's discovery request, it did not include the tape of Miller's interviews. The response included a summary of Miller's statements and a copy of Miller's rights-waiver form. The wording of the discovery response would have led anyone to believe that the rights had been waived first. (We do not ascribe any intentional misleading — the prosecutor did not know about the tape at that time.) Only the tape would have revealed that Miller had not waived his rights until he spoke with Vaughn, because the rights-waiver form did not state exactly when Miller waived his rights. It is understandable that Miller's attorneys had assumed that Miller had waived his rights before any of his interviews with police.
 {¶ 34} Perhaps counsel on both sides could have inquired further — the state could have made sure there was no tape (and found that there was). And the defense could have inquired further about when Miller had waived his rights, given that he was questioned both at the hospital and at the station.
 {¶ 35} But even if Miller's attorneys had fallen below an objective standard of reasonable representation, there was not a reasonable probability that Miller would have *Page 10 
been acquitted if his first statements had not been introduced. As we have already noted, Miller told three stories. Only the first story — when he gave a fake name and said that he had been attacked by a group of men with a knife — would have been suppressed.
 {¶ 36} Miller had the burden of proving, by a preponderance of the evidence, that he had killed Perkins in self-defense. The jury still would have heard Miller tell Vaughn that he had visited Perkins to collect a drug debt, and it also would have heard testimony that he had carried a gun when collecting drug debts. The jurors would have known that he was either lying to Vaughn or lying on the stand. Furthermore, it is difficult to claim self-defense when the victim is shot in the back. There was no reasonable probability that the jury would have found that Miller had killed Perkins in self-defense if his story about the knife-wielding robbers had not been introduced.
 IX. Cumulative Error {¶ 37} Miller argues that the cumulative effect of the errors denied him a fair trial. Not so. Although there were errors, Miller's trial was fair.
 {¶ 38} For the foregoing reasons, the assignments of error are without merit, and we affirm the trial court's judgment.
Judgment affirmed.
HILDEBRANDT, P.J., and CUNNINGHAM, J., concur.
[1] State v. Traore, 1st Dist. No. C-060802, 2007-Ohio-6334, at ¶ 12.
[2] Id.
[3] State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 73.
[4] Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602.
[5] State v. Jells (1990), 53 Ohio St.3d 22, 32, 559 N.E.2d 464.
[6] Strickland v. Washington (1984), 466 U.S. 668, 692,104 S.Ct. 2052.
[7] Crim. R. 16(B).
[8] State v. Bidinost, 71 Ohio St.3d 449, 456, 1994-Ohio-465,644 N.E.2d 318.
[9] State v. Parson, 6 Ohio St.3d 442, 453 N.E.2d 689, syllabus.
[10] Strickland v. Washington, supra. *Page 1